UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
DEFER LP,

                         Plaintiff,

                -against-                                            08 Civ. 3449 (LAK)

RAYMOND JAMES FINANCIAL, INC., et al.

                         Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/2/10

## MEMORANDUM OPINION

Appearances:

Daniel C. Girard
Jonathan K. Levine
Aaron M. Sheanin
Christina H. C. Sharp
GIRARD GIBBS LLP

Norman E. Siegel
STUEVE SIEGEL HANSON LLP

Christopher A. Seeger
Stephen A. Weiss
David R. Buchanan
SEEGER WEISS LLP
*Attorneys for plaintiff.*

Christian R. Bartholomew
Jill Baisinger
MORGAN, LEWIS & BOCKIUS LLP
*Attorneys for defendants.*

LEWIS A. KAPLAN, *District Judge*.

      As previously noted,[1] this is a purported class action by investors in auction rate securities ("ARS") against a financial services firm and its two wholly-owned subsidiaries that underwrote, marketed and sold the securities and managed the auctions at which the interest rates they paid were set.  Plaintiffs claim that the defendants engaged in a scheme to defraud ARS purchasers by knowingly misrepresenting the securities as highly liquid investments.  The matter is before the Court on defendants' motion to dismiss the second amended complaint ("SAC") for failure to state a claim upon which relief may be granted.

*Background*

*Auction rate securities*

      ARS are long-term bonds or preferred stocks that pay interest or dividends at rates set by periodic "Dutch" auctions.[2]  The auctions, which were managed by "auction dealers,"[3] generally occurred every 7, 28, 35, or 49 days and determined which investors would own the securities and the interest rate or dividends they would pay until the next auction.[4]  Auction participants could buy, sell, or hold their securities.[5]  In the typical auction, participants submitted

---

[1]     *Defer LP v. Raymond James Fin., Inc.*, 654 F. Supp.2d 204, 206 (S.D.N.Y. 2009) (dismissing First Amended Class Action Complaint with leave to amend).

[2]     SAC ¶¶ 2, 36.

[3]     *Id.* ¶ 42.

[4]     *Id.* ¶ 40.

[5]     *Id.*

bids for the quantities of securities they wished to purchase or sell and the prices at which they wished to do so.[6]  If the number of shares sought to be purchased at a particular price equaled or exceeded the number shares offered at that price, the auction would be successful,[7] and the securities' interest or dividend rate would be set at the lowest price at which this occurred.  This was known as the "clearing rate."[8]  An auction failed when supply exceeded demand.  In that case, none of the security holders could sell their shares, and the dividend or interest reset to a predetermined rate known as the "maximum rate."[9]

ARS were attractive to issuers because they could obtain long-term financing at less expensive, short-term interest rates.[10]  They were attractive to investors because they provided a better return than cash and were said to have been nearly as liquid.[11]  Nearly $330 billion in ARS were outstanding by February 2008, a nearly twenty-five percent increase over the $263 billion in ARS outstanding at the end of 2005.[12]

---

[6]      *Id.* ¶ 43.

[7]      *Id.*

[8]      *Id.*

[9]      *Id.* ¶ 44.

[10]      *Id.* ¶ 41.

[11]      *Id.*

[12]      *Id.* ¶ 38.

*Alleged market manipulation*

The SAC alleges that financial firms (including defendants) underwrote and sold ARS between April 8, 2003 and February 13, 2008 (the "Class Period") with maximum rates that were insufficient to ensure their liquidity if the auctions setting their rates failed.[13]  The firms allegedly masked the risk that ARS would become illiquid by routinely (1) placing "support bids" – that is, making bids to purchase ARS for their own accounts – to ensure successful auctions[14] and (2) setting clearing rates high enough to ensure auction success.[15]  These interventions were "extensive and sustained," creating the appearance that ARS were highly liquid investments and depriving investors of information about their true risks.[16]  According to the SAC, there would have been widespread auction failures had these support bids not been made.[17]  Had that occurred, the ARS holders would not have been able to sell their securities.

*Auction failures*

Auction dealers are alleged uniformly to have placed support bids until August 2007 to ensure successful auctions.  At that time, some auction dealers stopped placing support bids for

---

[13]
    *Id.* ¶ 46.

[14]
    *Id.* ¶¶ 47-57.

[15]
    *Id.* ¶¶ 58-60.  The firms placed support bids pursuant to an alleged "tacit understanding" that they would prevent auction failures.  *Id.*

[16]
    *Id.* ¶¶ 54, 60.  For example, after January 1, 2006, UBS placed support bids in more than 30,000 auctions of two types of ARS and in 27,000 auctions of another.  *Id.* ¶ 52.  After January 3, 2006, Merrill Lynch placed support bids in more than 5,800 ARS auctions.  *Id.*

[17]
    *Id.* ¶ 57.

a "limited number" of auctions related to securities backed by risky assets like collateralized debt obligations.[18]  These auction failures, however, were not widely known, and the dealers continued to support auctions until around February 13, 2008,[19] when all major auction dealers, including defendants, stopped intervening with support bids for the auctions, and eighty-seven percent of the ARS auctions failed.[20]  Consequently, more than $300 billion in ARS became illiquid.[21]

*Defendants*

Defendant Raymond James Financial, Inc. ("RJF"), is a financial services holding company.[22]

RJF's primary subsidiary is defendant Raymond James & Associates, Inc. ("RJA"). RJA is a self-clearing broker-dealer that, *inter alia*, underwrote offerings of ARS, managed ARS auctions, and sold ARS to class members.[23]  Before and during the Class Period, RJA underwrote more than $1.2 billion and was the auction dealer for more than $725 million ARS.[24] It also sold ARS managed by other auction dealers through its financial advisors to its clients.

---

[18]

   *Id.* ¶¶ 51-54.

[19]

   *Id.* ¶ 51.

[20]

   *Id.* ¶ 61.

[21]

   *Id.* ¶ 63.

[22]

   *Id.* ¶ 14.

[23]

   *Id.* ¶ 15.

[24]

   *Id.* ¶¶ 65-66.

Defendant Raymond James Financial Services, Inc. ("RJFS"), another wholly-owned subsidiary of RJF, is a registered broker-dealer and sold ARS to class members through its financial advisors.[25]  Like RJA, RJFS sold ARS managed by other auction dealers to its clients.[26]

*Prior proceedings*

On December 1, 2008, plaintiffs filed the First Amended Class Action Complaint ("FAC") alleging that the defendants were liable under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder.[27]  The FAC alleged that defendants knowingly misrepresented ARS to potential investors as highly liquid investments.  The Court granted the defendants' motion to dismiss for failure to state a claim in light of the FAC's failure specifically to attribute the allegedly actionable statements to any defendant and to plead with particularity any defendant's *scienter*.[28]  Plaintiffs were granted leave to replead, and they filed the SAC on October 16, 2009.[29]

*The SAC*

The SAC is brought on behalf of all persons and entities that purchased ARS from

---

[25]

*Id.* ¶ 16.

[26]

RJF, RJA, and RJFS collectively will be referred to as Raymond James.

[27]

15 U.S.C. §§ 78j, 78t; 17 C.F.R. § 240.10b-5.

[28]

*Defer*, 654 F. Supp. 2d at 213-214, 216-17.

[29]

*Id.* at 220; *see also* docket item 50.

7

RJA and RJFS during the Class Period.[30]  It seeks relief against RJA and RJFS under Exchange Act

Section 10(b) and SEC Rule 10b-5 and against RJA and RJF as "controlling persons" of RJFS under

Exchange Act Section 20(a).

The essence of plaintiffs' claims is that RJA and RJFS routinely and consistently

represented to their financial advisors that ARS were equivalent to cash and were highly liquid,

short-term investment vehicles suitable for any investor with at least $25,000 of available cash and

as little as one week in which to invest it when, in fact, the ARS's liquidity was a facade and wholly

dependent on auction dealer intervention in the market.[31]  The SAC alleges that RJA and RJFS

omitted to disclose that ARS (1) were not cash, but financial instruments with long maturity periods,

(2) lacked features designed to ensure the security-holder's ability to sell, (3) were subject, in some

cases, to interest rate caps that would reset interest rate levels to below-market rates, (4) traded in

an illiquid market that was supported by manipulation and depended on auction dealer intervention,

(5) required active participation from investors in the auction bidding to earn the highest returns, and

(6) would be salable only at substantial discounts from their purchase prices if the auctions failed.[32]

The SAC alleges that defendants were aware that the ARS were not equivalent to

cash, that broker-dealers routinely intervened in auctions to maintain the appearance of liquidity and

---

[30]

    *Id.* ¶ 2.

[31]

    *Id.* ¶ 144.  The information conveyed to the financial advisors allegedly was contained on an internal website and in emails and internal newsletters.  *See, e.g.*, ¶¶ 71-75, 78-80, 99-105.

[32]

    *Id.* ¶ 147; *see also* ¶ 148.

stability, and managed the ARS's interest rates.[33]  According to the SAC, however, the individual financial advisors who marketed the ARS to clients "lacked a rudimentary understanding about [ARS] and how the [ARS] market functioned during the Class Period."[34]

*Disclosures*

> Defendants allegedly made no disclosures to investors about the true nature of ARS or the risks of illiquidity and auction failure until January 2007.  At that time, however, defendants' trade confirmations for ARS transactions stated that ARS (1) offered payments at rates determined by a "competitive bidding process" called a "Dutch auction," (2) were "subject to a failed auction risk," and (3) did not guarantee that any particular auction would be successful or that the securities would trade at par in the absence of successful auctions.[35]

> In August 2007, some auction dealers, not including defendants, stopped supporting auctions of ARS backed by collateralized debt obligations and other allegedly "risky" investments, and some auctions failed.[36]  Shortly thereafter, defendants published a public website disclosing that ARS were subject to the risk of a failed auction, that the securities might become illiquid, and that Raymond James might "routinely" place orders in the auction or place bids likely to affect the clearing rate.  It disclosed also that it might, in "exceptional circumstances," intervene to prevent

---

[33]
> *See, e.g., id.* ¶ 114.

[34]
> *Id.* ¶ 146.

[35]
> *Id.* ¶¶ 89-90.

[36]
> *Id.* ¶ 86.

a failed auction and encourage others to bid to prevent a failed auction.[37]  The defendants did not, however, systematically alert investors who previously had purchased ARS from Raymond James of this website or these newly disclosed risks and continued to market ARS as short-term investments.[38]  Neither plaintiff, nor any other investor, is alleged ever to have seen this website.[39]

*Plaintiffs' purchases of ARS*

Plaintiff Laurie Rubin learned about ARS from Richard W. Barnard, an RJFS financial advisor beginning prior to the start of the Class Period and continuing until February 2008.[40]  At some time prior to April 2003, Barnard allegedly encouraged Rubin to invest in ARS as "good cash management vehicles" that were "safe, short-term investments" similar to money market funds.[41]  Rubin purchased ARS several times during the Class Period based exclusively on the advice that Barnard provided in telephone conversations and by email.[42]  Rubin never received a prospectus for the ARS she had purchased or any description of Raymond James's ARS practices and procedures.[43]  Nor was she ever told about the allegedly undisclosed risks described above.

---

[37]      *Id.* ¶¶ 86, 111-12, 115, 124.

[38]      *Id.* ¶¶ 115-116.

[39]      *See id.* ¶¶ 86, 111, 115, 124.

[40]      *Id.* ¶ 150.

[41]      *Id.* ¶¶ 154-55, 161.

[42]      *Id.* ¶¶ 158, 160, 162, 164.

[43]      *Id.* ¶¶ 165-67.

Plaintiff Jonathan Gold learned about ARS from RJA on January 24, 2008 from Scott A. Abraham, an RJA senior vice president of investments and financial advisor.[44]  Gold asked Abraham to recommend a safe and liquid investment for the cash in his account, and Abraham recommended ARS issued by Jefferson County, Alabama.[45]  Abraham allegedly did not inform Gold about the risk of auction failure, how the auctions were conducted, or RJA's role in underwriting and managing the auctions for these securities.[46]  Gold did not receive a prospectus for his ARS or any documents about Raymond James's ARS practices.[47]  He purchased the securities based exclusively on Abraham's advice.

## Discussion

I.    *Legal Standard*

In deciding a motion to dismiss, a court ordinarily accepts as true all well pleaded factual allegations and draws all reasonable inferences in the plaintiff's favor.[48]  In order to survive such a motion, however, "the plaintiff must provide the grounds upon which [its] claim rests through

---

[44]
　　*Id.* ¶¶ 173-75.

[45]
　　*Id.* ¶ 177.

[46]
　　*Id.* ¶¶ 178, 182 185-88.

[47]
　　*Id.* ¶¶ 183-84.

[48]
　　*See Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 14 (2d Cir. 2001).

factual allegations sufficient 'to raise a right to relief above the speculative level,'"[49] and to '"state a claim to relief that is plausible on its face.'"[50] In securities fraud cases such as this, the complaint must also satisfy the particularity and other requirements of the Private Securities Litigation Reform Act and Federal Rule of Civil Procedure 9(b).

Although a motion to dismiss is addressed to the face of the challenged pleading, the court may consider also documents attached to or incorporated by reference in the complaint as well as legally required public disclosure documents and documents possessed by or known to the plaintiff upon which it relied in bringing the suit.[51]

## II.    *Exchange Act Section 10(b) and Rule 10b-5*

In order to state a claim for securities fraud under Section 10(b) of the Exchange Act and Rule 10b-5, a plaintiff must allege that "the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with *scienter*, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff."[52] As the main point of

---

[49]    *ATSI Commc'ns., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (declining to limit *Twombly* to antitrust cases).

[50]    *Iqbal*, 129 S.Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570).

[51]    *ATSI Commc'ns, Inc.*, 493 F.3d at 98; *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) (citing *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989); *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)).

[52]    *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase* Co., 553 F.3d 187, 197 (2d Cir. 2009) (hereinafter "*ECA*") (quoting *Lawrence v. Cohn*, 325 F.3d 141, 147 (2d Cir. 2003) in turn quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000)).

contention between the parties is whether the SAC sufficiently alleges defendants' *scienter*, the Court begins its analysis with that issue.

*A.*    Scienter

The Private Securities Litigation Reform Act requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind."[53]  The requisite state of mind is an "intent to deceive, manipulate, or defraud."[54]  In this Circuit, allegations of recklessness – "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it" – are sufficient.[55]

The question whether an inference of *scienter* is "strong" necessarily is comparative. Courts must consider the alleged facts and any inferences favoring plaintiffs that rationally may be drawn from those facts and compare them to "plausible, nonculpable explanations for the defendant's conduct."[56]  An alleged inference of *scienter* is strong "only if a reasonable person would deem [it] cogent and at least as compelling as any opposing inference one could draw from

---

[53]

15 U.S.C. § 78u-4(b)(2); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 552 U.S. 308, 314 (2007).

[54]

*S. Cherry Street, LLC v. Hennessee Group LLC*, 573 F.3d 98, 108 (2d Cir. 2009) (quoting *Tellabs, Inc.*, 552 U.S. at 313); *see also ECA*, 553 F.3d at 198.

[55]

*Id.* (quoting *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000)); *Teamsters Local 445 Freight Division Pension Fund v. Synex Capital Inc.*, 531 F.3d 190, 194 (2d Cir. 2008) (hereinafter "*Teamsters Local*").

[56]

*Tellabs, Inc.*, 552 U.S. at 324.

the facts alleged."[57]

An inference of *scienter* ordinarily is pled "by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior."[58] Conclusory allegations are insufficient. "[A] pleading technique [that] couple[s] a factual statement with a conclusory allegation of fraudulent intent is insufficient to support the inference that the defendants' acted recklessly or with fraudulent intent."[59]

### 1.   *RJA's* scienter

#### a.   *Motive and Opportunity*

To establish a strong inference of *scienter* via the "motive and opportunity" theory, a plaintiff must allege that the defendants "benefitted in some concrete and personal way from the purported fraud."[60]

Plaintiffs here allege that RJA was motivated to commit the alleged fraud in order to "unload" its inventory of ARS, reducing its exposure to soon-to-be-illiquid securities.[61] They rely

---

57

    *Id.*

58

    *ATSI Commc'ns., Inc.*, 493 F.3d at 99 (quoting *Ganino*, 228 F. 3d at 168-69); *see also ECA*
    553 F.3d at 198.

59

    *Rombach v. Chang*, 355 F.3d 164, 176 (2d Cir. 2004) (internal quotation marks and
    citations omitted).

60

    *ECA*, 553 F.3d at 198 (quoting *Novak*, 216 F.3d at 307-08).

61

    Pl. Br. at 26.

on allegations that (1) the ARS market deteriorated between August 2007 and February 2008, (2) RJA employees sent three emails in November and December 2007 to financial advisors allegedly indicating that RJA had a large inventory of ARS and offering incentives to sell them, and (3) RJA needed to sell ARS in late 2007 to comply with its internal risk limits.[62]

        A motive must antedate the alleged fraud.  It is the "stimulus that *causes* a person or entity to act or to fail to act," and "*anticipates* a concrete benefit defendant would realize by his conduct."[63]  Accordingly, a classic case of a motive suggestive of *scienter* is the making by corporate insiders of false positive statements, which tend to maintain a high stock price, shortly before selling shares for their own benefit.[64]  The prospect of financial gain flowing from the higher stock price gives rise to a cogent and rationale inference that the false positive statements were made in order to line the insiders' pockets.

        The SAC alleges that RJA was motivated, beginning in November 2007, by a desire to "unload" its inventory of soon-to-be-illiquid ARS on its customers.[65]  But, according to the SAC, the alleged fraud began at least as early as April 2003, over four years before RJA allegedly came to the conclusion that it should unload the ARS held for its own account on its customers.[66] Certainly RJA could not have been motived between April 2003 and November 2007 by a desire

---

[62]
      SAC ¶¶ 77-81.

[63]
      *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74 (2d Cir. 2001) (emphasis added).

[64]
      *See, e.g., id.; Novak*, 216 F.3d at 307-08.

[65]
      *See id.*

[66]
      *E.g., id.* ¶¶ 2, 52-57.

to unload its own ARS inventory, if indeed it had one during that period, before coming to the conclusion that its inventory should be reduced or sold entirely. Thus, the SAC alleges no motive for fraudulent behavior during the period April 2003 until November 2007.[67]

The period November 2007 through February 2008 stands differently. According to the SAC, RJA then had an inventory of ARS for its own account, which it wished to reduce to comply with its internal risk limits. It provided financial advisors with incentives to sell those securities. Given the deterioration of the ARS market that began in August 2007 and RJA's wish to reduce its own position from November 2007 forward, it is quite reasonable to infer that RJA then had a motive to conceal the ARS illiquidity risk from customers to whom it hoped to sell ARS from its own portfolio. Accordingly, plaintiffs sufficiently allege the existence of a motive and an opportunity with respect to the period November 2007 thorough the end of the Class Period.

> b.    *Conscious misbehavior or recklessness*

A plaintiffs may allege *scienter* also by pleading facts that amount to strong circumstantial evidence of conscious misbehavior or recklessness, "'though the strength of the circumstantial allegations must be correspondingly greater' if there is no motive."[68] A complaint sufficiently alleges strong circumstantial evidence of *scienter* when it asserts that defendants "knew facts or had access to information suggesting that their public statements were not accurate" or

---

67

     *See Acito v. Imcero Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) (stock sales before alleged misrepresentations fail to provide an inference of intent to deceive).

68

     *ECA*, 553 F.3d at 199 (quoting *Kalnit*, 264 F.3d at 142).

"failed to check information they had a duty to monitor."[69]  It must, however, show that the

defendant contemporaneously was faced with specific facts or information – so called "red flags"

– contradicting its allegedly false and misleading statements or imposing a duty to investigate

further.[70]  The SAC fails to do so with respect to the period prior to November 2007.

Plaintiffs' theory of *scienter* is that RJA knew or was reckless in not knowing that

the ARS market appeared to be liquid only because of auction broker intervention.[71]  The SAC,

however, is devoid of non-conclusory allegations[72] that RJA knew that the ARS market as a whole,

let alone the parts in which it dealt, were liquid only because other auction dealers systematically

placed support bids to ensure successful auctions.  The closest it comes are allegations that the SEC

issued a cease and desist order on May 31, 2006 to other auction brokers to end "undisclosed

manipulative practices" with respect to ARS.[73]  The SAC alleges that the SEC order required those

---

69

     *Id.*; *Novak*, 216 F.3d at 311; *see Teamsters Local*, 531 F.3d at 194.

70

     *Chill v. Gen. Elec.*, 101 F.3d 263, 269 (2d Cir. 1996).

71

     Pl. Br. at 19-26.

72

     The SAC's conclusory allegations regarding RJA's knowledge include:  "Defendants' website disclosure is an acknowledgment that Defendants knew that RJA and other auction dealers (a) intervened in auctions for their own benefit or in order to prevent failed or all-hold auctions; (b) intervened in auctions directly or indirectly to set or influence the interest or dividend rate; and (c) did so as market-makers with knowledge of the bids of other auction participants." SAC ¶ 114. "RJA and RJFS had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with deliberate disregard for the truth and gross recklessness in that they failed to ascertain and to disclose such facts." *Id.* ¶ 236. "RJA and RJFS made the material misrepresentations and/or omissions described herein knowingly or deliberately . . . ." *Id.* ¶ 237. "If RJA and RJFS did not have actual knowledge of the misrepresentations and omissions alleged herein, they were grossly reckless in failing to obtain such knowledge and refraining from taking those steps necessary to discover whether those statements were false or misleading." *Id.* ¶ 238.

73

     None of the defendants were named in the order. *Id.* ¶ 118.

dealers to end or fully disclose the practices to current and future ARS clients.[74]  The SAC fails, however, to allege with sufficient particularity how the SEC order would have alerted RJA to the (alleged) fact that the entire ARS market was liquid only because of systematic auction dealer intervention.  It does not allege (1) the nature of the allegedly manipulative practices that were the subjects of the SEC complaint, (2) the extent to which those prevailed in the ARS market, and (3) whether those practices affected any of the ARS underwritten or sold by RJA.  It moreover fails to allege if and when RJA became aware of the SEC order or whether the practices it ordered stopped continued.[75]  The SAC therefore fails adequately to plead *scienter* on this basis.

Plaintiffs argue also that RJA's knowledge that other auction dealers systematically propped up the ARS market by placing support bids to prevent auction failures may be inferred from the facts that RJA (1) was an ARS underwriter and broker-dealer, (2) made "selective and incomplete" disclosures during the Class Period, and (3) deliberately withheld information from the financial advisors.[76]  None of these allegations is sufficient.

Plaintiffs maintain first that RJA was "obligated to know that the ARS market functioned only as a resulted of systematic auction dealer intervention" because it was an

---

[74]

*Id.* ¶ 117.

[75]

The SAC alleges also that John Hamm emailed RJA and RJFS financial advisors a link to a news article describing "auction failures in another part of the auction rate securities market." *Id.* ¶ 129.  This allegation similarly is insufficient to show that RJA knew about the *widespread* auction broker intervention that underlies the SAC.  In any event, this email could not support an inference of knowledge until the date it was sent – January 30, 2008, only fourteen days before the end of the class period.

[76]

Pl. Br. at 1, 19-26.

underwriter and a broker-dealer of ARS.[77]   They rely on cases that have stated generally that underwriters of securities have greater access to information about those securities than other market participants and have  concluded that underwriters of ARS therefore were "obligated to know" how the market functioned.[78]   They contend also that broker-dealers have a duty to investigate securities they offer to their customers.[79]

These contentions are insufficient. Assuming *arguendo t*hat RJA had a duty to make some type of investigation and had access to more information than ordinary investors, such vague and general propositions do not rationally suggest that it knew of or had access to the particular fact that the entire ARS market was liquid only because of the auction brokers' systematic intervention.[80] The SAC fails to allege any specific facts that RJA would have discovered had it made a more searching inquiry or any information to which it had access that would have indicated any sort of systematic, market-wide wrongdoing, let alone that the market would have become illiquid in its

---

[77]

*Id.* at 19.

[78]

See *In re Worldcom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 662 (S.D.N.Y. 2004); *SEC v. Tambone*, 550 F.3d 106, 134 (1st Cir. 2008); *Solphin v. Bradbury, Inc. v. SEC*, 512 F.3d 634, 640 (D.C. Cir. 2008).

[79]

Pl. Br. at 19.

[80]

See *Novak*, 216 F.3d at 311; *Chill*, 101 F.3d at 269-70 (affirming dismissal for lack of *scienter* where alleged facts would not necessarily have indicated misconduct to defendant); *see also*, *e.g.*, *In re Worldcom, Inc. Sec. Litig.*, 346 F. Supp. 2d at 681 (finding no *scienter* where the complaint failed to allege that underwriter, despite having access to facts, had reason to believe public statements were fraudulent); *In re Indep. Energy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741, 764 (S.D.N.Y. 2001) (finding status as underwriter, even one "intimately familiar with" the issuer, insufficient to establish scienter). *Cf. SEC v. McNulty*, 137 F.3d 732, 741 (2d Cir. 1998) (complaint sufficiently alleged *scienter* where statements were so obviously suspicious that outside counsel had recommended against their inclusion).

absence.[81]  RJA's participation in the ARS market, moreover, was relatively limited, further undermining any inference that it knew about systematic, market-wide actions by others.[82]  Both before and during the Class Period, it allegedly was an auction-dealer for $725 million, an underwriter for $1.2 billion, and a seller of $2.3 billion[83] worth of ARS.  The total value of ARS outstanding by the end of the Class Period, however, was $330 billion.[84]  Accordingly, RJA's status as an ARS underwriter in an insufficient basis upon which to infer RJA's *scienter*.

Plaintiffs next argue that RJA's *scienter* may be inferred because it provided selective and incomplete disclosures to investors.  They point to three documents, each of which provided progressively more information about the ARS market to investors than the last:

- RJA's trade confirmations before January 2007 failed to disclose ARS's risks of illiquidity and auction failure.[85]

---

[81]
The only specific factual allegation to which plaintiffs point in this section of their brief is an email from John Plunkett, an RJA managing director, stating that ARS interest rates were rising because "dealers [were] attempting to purge . . . inventory" from their books.  Pl. Br. at 20; SAC ¶ 79.  This email, however, even construed in the light most favorable to plaintiffs, in no way indicates that RJA knew of the alleged fraud that allegedly kept the ARS market liquid.

The alleged post-Class Period statements are insufficient also.  None contain sufficiently particular facts showing that RJA knew about the auction brokers' systematic intervention in the ARS market at the time any of the earlier statements were made.  *See* SAC ¶¶ 139-143.

[82]
*See Defer*, 654 F. Supp. 2d at 219.

[83]
SAC ¶¶ 66-67.

[84]
*Id.* ¶ 38.

[85]
*Id.* ¶¶ 89.

- It revised its trade confirmations in January 2007 to disclose that ARS interest rates were set at Dutch auction "competitive bidding process" and "subject to failed auction risk."[86]

- In August 2007, "after the first auctions began to fail," RJA revised a page on its website to indicate that auctions may fail and that RJA sometimes placed support bids to prevent failures.[87]

They argue that each of these disclosures was incomplete because each failed to indicate the full extent to which the ARS market depended on auction-broker intervention.[88] But the argument presupposes that RJA knew of the extent to which market liquidity depended upon auction-broker intervention. Absent such knowledge, these successive disclosures simply do not support an inference of *scienter*.[89] As noted, however, the SAC is devoid of any particularized factual allegations demonstrating such knowledge.

Plaintiffs' arguments that (1) RJA "deliberately withheld material information about ARS and the condition of the ARS market from" financial advisors to ensure they would not disclose it to investors and (2) violated its internal policies suffer from the same flaw.[90] Absent sufficiently particular allegations that RJA knew or recklessly did not know of the allegedly

---

[86]   Pl. Br. at 21; SAC ¶ 90, 93-94.

[87]   Pl. Br. at 22.

[88]   *Id.* at 20-22; SAC ¶¶ 93-94, 113, 117-18.

[89]   *See Acito*, 47 F.3d at 53 ("[A]llegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud.")

[90]   Pl. Br. at 20-21, 23.

withheld information, the SAC cannot support an inference that RJA acted with fraudulent intent.

\*   \*   \*

Accordingly, the SAC fails to allege particular facts supporting an inference of RJA's *scienter* except with respect to the period November 2007 through the end of the Class Period in February 2008.

2.    *RJFS's* scienter

The SAC contains no direct allegations with respect to RJFS's *scienter*. It instead argues that RJA's *scienter* may be attributed to RJFS because (1) RJFS was an affiliate of RJA and (2) RJFS was RJA's agent.[91] They rely principally on *In re Marsh & McLennan Cos., Inc. Sec. Litig.*[92] for the proposition that a "corporation may be liable for its affiliate's misconduct based on allegations of the corporation's 'awareness, reckless disregard, and complicity in the misbehavior' of the affiliate."[93]

The complaint in *Marsh & McLennan* sought to attribute the *scienter* of Marsh & McLennan to its corporate parent, MMC. It alleged facts indicating MMC's "familiarity with the

---

[91]

Pl. Br. at 17 (quoting *In re Marsh & McLennan Co. Sec. Litig.*, 501 F. Supp. 2d 452, 483 (S.D.N.Y. 2006)).

As the SAC does not allege RJF violated Exchange Act Section 10 or SEC Rule 10b-5, there are no *scienter* allegations against it.

[92]

501 F. Supp. 2d 452 (S.D.N.Y. 2006). Plaintiffs rely also on *Carlson v. Xerox Corp.*, 392 F. Supp. 2d 267, 286-87 (D. Conn. 2005). It is insufficient to support imputing RJA's *scienter* to RJFS for the same reason as *Marsh & McLennan*.

[93]

Pl. Br. at 17.

subsidiary's operations and, ultimately, its misconduct,"[94] including that Marsh was MMC's largest and most prominent business and generated approximately sixty percent of its revenue.[95]  Moreover, the MMC chief executive officer was said to have described the allegedly improper conduct at Marsh as "part of [MMC's] business model."[96]  The court concluded that these allegations were sufficient to impute the subsidiary's *scienter* to the parent because the parent knew about and approved of the subsidiary's intentional misconduct.

This Court assumes, without deciding, the validity of the *Marsh & McLennan* court's analysis.  But that analysis does not take the plaintiffs here where they want to go, as allegations of the SAC are the opposite of what would be necessary to attribute RJA's *scienter* to RJFS under the *Marsh & McLennan* theory.

The *Marsh* case attributed the *scienter* of the subsidiary to the parent on the basis that the parent arguably had known and approved of the fraud carried out by the subsidiary.  Here, in contrast, plaintiff seeks to attribute the fraud of RJA to an affiliate, RJFS, on the quite different theory that RJA (1) provided RJFS financial advisors with information about municipal ARS,[97] and (2) controlled the commission rates paid to RJFS financial advisors.[98]  But the fact that RJA provided RJFS with unspecified information about ARS says nothing about whether it told RJFS

---

[94]      *In re Marsh & MecLennan Co. Sec. Litig.*, 501 F. Supp. 2d at 483.

[95]      *Id.* at 483.

[96]      *Id.*

[97]      SAC ¶¶ 21, 71-72, 100-105.

[98]      *Id.* ¶¶ 70, 80.

whatever it knew or, instead, effectively misled RJFS.  Indeed, the SAC alleges that the RJFS financial advisors "lacked a rudimentary understanding about how the [ARS] market functioned during the class period,"[99] which tends to suggest that both they and RJFS generally were kept in the dark.  And RJA's alleged control of commission rates paid to RJFS financial advisors simply does not bear on whether it communicated its allegedly guilty knowledge to RJFS.

Plaintiffs' agency theory is even more dubious.  Even assuming that RJFS could be considered RJA's agent – a questionable assumption here – plaintiffs have provided no support for the proposition that a principal's *scienter* may be attributed to an agent.  This is not surprising as "an agent generally is not liable for the acts of co-agents or, for that matter, any other person or entity that the agent does not control."[100]

As there is no basis to attribute RJA's *scienter* to RJFS, the Section 10 and Rule 10b-5 claims against RJFS are insufficient.

### B.    *Existence of actionable misstatements or omissions*

The SAC alleges that RJA made false and misleading statements to plaintiffs.  As in the FAC, plaintiffs allege misstatements and omissions regarding (1) plaintiffs' particular transactions and (2) the alleged scheme as a whole. Having determined that the SAC sufficiently alleges *scienter* only with respect to the period beginning in November 2007, the Court confines its analysis to the statements made during that period.

---

[99]     *Id.* ¶ 145.

[100]    *In re Parmalat Sec. Litig.*, 377 F. Supp. 2d 390, 406 (S.D.N.Y. 2005).

As the particularity requirements of the PSLRA[101] and Rule 9(b) apply,[102] the SAC must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."[103]

### 1.    *Misstatements and omissions relating to plaintiffs' transactions*

#### a.    *Laurie Rubin*

The SAC alleges that Richard W. Barnard, a financial advisor in RJFS's Chicago office, advised Rubin to invest in ARS because they were "safe, short-term investments, that they were similar to money market funds, that they were good cash management vehicles, and that they were better than keeping money in the bank."[104]  Barnard allegedly repeated this advice to Rubin throughout the Class Period via phone and email.[105]  He is said to have encouraged her to purchase ARS into the first week of February 2008.[106]  These statements allegedly were false because the ARS market was not actually liquid, but only appeared to be that way as a result of auction dealer intervention.

---

[101]

15 U.S.C. § 78u-4(b).

[102]

FED. R. CIV. P. 9(b).

[103]

15 U.S.C. § 78u-4(b)(2).

[104]

SAC ¶ 155.

[105]

*Id.* ¶ 160.

[106]

*Id.* ¶ 164.

The Court assumes, without deciding, that Barnard's statements were materially false or misleading. Barnard, however, is not a defendant in this action and, moreover, is not accused of having known of the falsity of his representations or of having made them in reckless disregard of their truth. The statements therefore are actionable only if they were made by Barnard on behalf of a party as to which Ms. Rubin sufficiently has pleaded *scienter*. In other words, the "fraudulent statements must be linked directly to the party accused of the fraudulent intent."[107]

Barnard was employed by RJFS, and his statements certainly were within the scope of his employment by that entity.[108] As noted above, however, the SAC fails to plead *scienter* on the part of RJFS. In consequence, there is no basis for holding RJFS liable on the basis of Barnard's representations to Ms. Rubin.

The SAC alleges also, in conclusory terms, that Barnard "was acting as an agent of ... RJA"[109] as to which the *scienter* allegations are sufficient with respect to the November 2007-February 2008 period. But while the allegation of agency is not subject to the particularity requirements of the PSLRA and Rule 9(b),[110] it nevertheless is a legal conclusion and must be

---

[107]

*Defer*, 654 F. Supp. 2d at 212 (quoting *380544 Canada, Inc. v. Aspen Tech., Inc.*, 544 F. Supp. 2d 199, 218 (S.D.N.Y. 2008)).

[108]

*Id.* at 213.

[109]

SAC ¶ 156.

[110]

*See In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 290-91 (S.D.N.Y. 2005) (declining to impose heightened pleading requirement on allegations of agency where allegations were a basis for imposing vicarious liability only and "not so closely intertwined with the claim of securities fraud that it [wa]s a circumstance of the fraud itself."). *Cf. Kolbeck v. Lit. Amer., Inc.*, 923 F. Supp. 557, 569 (S.D.N.Y. 1996) (applying Rule 9(b) to allegations of agency where plaintiffs claimed that third party misled them to believe he was defendant's agent as the alleged agency was an integral element of the fraud).

credited on this motion only if the SAC alleges facts that, if proved, would establish that Barnard was RJA's agent as well as an employee of RJFS.[111]  It does not do so.

   An agency relationship exists only if "the principal has the right to control the manner and method in which the agent performs his work and the agent has the power to act on the principal's behalf."[112]  The only factual allegations respecting the relationship between RJA and Barnard are that Rubin's trades were executed through RJA and that Barnard received information from RJA about ARS, was provided with a list of RJA's inventory of ARS available for sale, and was encouraged by RJA to encourage his clients to purchase ARS.[113]  These allegations, assuming them to be true, are insufficient to show that RJA had the right to control the manner in which Barnard did his job as an RJFS broker.

   Accordingly, the SAC fails to allege facts sufficient to state a legally sufficient claim against either RJFS or RJA on the basis of Barnard's alleged statements to Ms. Rubin.

    *b.*  *Jonathan Gold*

   The SAC alleges that in January 2008, Scott A. Abraham, a senior vice president and financial advisor in RJA's Locust Valley, New York office, advised Gold to invest in ARS because

---

[111]

   *See Cabrera v. Jakabovitz*, 24 F.3d 372, 386 n.14 (2d Cir. 1994) ("Agency is a legal concept which depends upon the existence of required factual elements[.]"); *see also Iqbal*, 129 S.Ct at 1949 ("[T]he tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions.").

[112]

   *In re Parmalat Sec. Litig.*, 377 F.Supp.2d at 402.

[113]

   SAC ¶¶ 153, 156, 159,164.

they were a "safe, short-term investment with monthly liquidity and that they were highly rated."[114]

These statements allegedly were false and misleading because they failed to disclose that the ARS market was not actually liquid, but appeared to be so only as a result of systematic auction dealer intervention. Although Abraham is not named as a defendant in the action, he is alleged to have been an employee of RJA, and his statements allegedly were made in the scope of his employment. Accordingly, those statements are attributable to RJA

Defendants first argue that the alleged omissions are not actionable because RJA had no duty to disclose them.[115] Such a duty arises from an affirmative statutory or regulatory obligation or the making of another statement which is materially misleading in the absence of the omitted information.[116] As plaintiffs have not identified any affirmative disclosure obligation, RJA would have been obligated to disclose only if there was a "substantial likelihood that the disclosure of the omitted fact would have been viewed by a reasonable investor as having significantly altered the 'total mix' of information available."[117]

RJA, through Abraham, allegedly told Gold that the ARS were a "safe, short-term investment with monthly liquidity and that they were highly rated."[118]    The SAC's allegations

---

[114]

*Id.* ¶ 177.

[115]

An omission is not actionable under the Exchange Act unless the speaker had a duty to disclose. *In re Morgan Stanley Info Fund Sec. Litig.*, 592 F.3d at 360; *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002) ("For an omission to be actionable, the securities laws must impose a duty to disclose the omitted information.").

[116]

*In re Morgan Stanley Info Fund Sec. Litig.*, 592 F.3d at 361, 365.

[117]

*In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267-68 (2d Cir. 1993).

[118]

SAC ¶ 177.

sufficiently allege that, at least by November 2007, the ARS market was liquid due, at least in large part, to the sustained and systematic intervention of auction brokers. With limited exceptions, auction dealers intervened in the market to prevent failures until around February 13, 2008.[119]  UBS and Merrill Lynch intervened in thousands of auctions from early 2006 until the market collapsed, many of which allegedly would have failed without their intervention.[120]  Other auction dealers intervened as well.[121]  These interventions allegedly were "extensive and sustained" and created the appearance of a liquid market.[122]  A trier of fact would be entitled to find that it would have been important to a reasonable investor, in deciding whether to buy or sell ARS, that the ARS – supposedly liquid investments – were liquid only because auction brokers routinely intervened in the auctions to ensure their success.   Accordingly, RJA was under a duty to disclose this information.

Defendants next argue that RJA did disclose the allegedly omitted information on its website and in its trade confirmations used after January 2007.  The trade confirmations RJA used from January 2007 until the ARS market crashed in February 2008 stated:

> "Auction rate securities offer payments which reset at predetermined intervals at rates determined by Dutch auction.  Dutch auction is a competitive bidding process by which securities are sold at the highest yield at which sufficient bids are received to sell all securities offered."

> "This security is subject to failed auction risk.  There is no assurance that any

---

[119]

Id. ¶ 51.

[120]

Id. ¶ 52.

[121]

Id. ¶ 53.

[122]

Id. ¶ 55.

> particular auction will be successful.  Neither the issuer, nor the broker-dealer, is
> obligated to take any action to ensure success.  In the absence of successful auctions,
> there is no assurance that a secondary market will develop or that the security will
> trade at par."[123]

The website, first published in the weeks after the August 2007 auction failures, provided similar

disclosures warning of the risk of a failed auction "when there are more sellers than buyers" and

that, although failed auctions were not "a frequent occurrence," they were "still a possibility."[124]

It noted also that "[i]n the event of a failed auction, there is no assurance or guarantee that an

interested party will step in to support the auction process . . . and there is no guarantee that a

secondary market will develop."[125]  It additionally stated that

> "[A]s part of its regular course of business, Raymond James may routinely:
>
>> (a) place one or more Orders in Auctions generally for its own account, even
>> after obtaining knowledge of some or all of the other Orders, and it may do
>> so in any particular auction;
>>
>> (b) place Bids on the firm's behalf or those of others, and may encourage
>> others to place Bids likely to affect the Clearing Rate (including preventing
>> the Clearing Rate from becoming the Maximum Rate) and the allocation of
>> securities being auctions (including displacing other Prospective Holders).
>
> "In addition, under exceptional circumstances Raymond James may:
>
>> (a) place one or more bids in auctions generally to prevent a Failed Auction
>> or a Clearing rate the Broker-Dealer believes is not a market rate at the time
>> it makes its Bid, even after obtaining knowledge of some or all of the other
>> Orders, but is not obligated to continue to place such Bids or to bid in any
>> particular Auction;
>>
>> (b) encourage bidding by others in Auctions generally to prevent a Failed

---

[123]

    *Id.* ¶ 90.

[124]

    *Id.* ¶ 112.

[125]

    *Id.*

Auction or a Clearing Rate it believes is not a market Rate, even after obtaining knowledge of some or all of the other Orders, and it may do so in any particular Auction."[126]

Warnings can render "alleged misrepresentations . . . immaterial as a matter of law [if] it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language."[127] These warnings, however, did not disclose the risk that is at the SAC's core – that the ARS were liquid only because of extensive and sustained auction broker intervention. It can not be said that no reasonable investor would have considered this omitted information important when deciding whether to invest in the allegedly liquid ARS.

Defendants final argument is equally unavailing. They argue that many of the documents relied upon in the SAC to establish that RJA omitted to disclose the ARS's risk of illiquidity in fact disclosed those risks.[128] Even if the Court could consider the documents that neither were attached to nor incorporated by reference into the SAC, and even if the defendants' characterization of them were accurate, there is no indication that this information ever was communicated to Gold before he purchased his ARS. In fact, the SAC alleges just the opposite.[129] Thus, they could not affect the SAC's fundamental allegation - that RJA, through its financial advisor, told Gold that ARS were safe, liquid investments when, in truth, they were not.

Accordingly, Gold's allegations with respect to Abraham's statements are sufficient

---

[126]

*Id.*

[127]

*Rombach*, 355 F.3d at 173 (quoting *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir.2002)).

[128]

Def. Br. at 33-36.

[129]

SAC ¶¶ 115, 178, 182-89.

to state a claim upon which relief may be granted.

2.    *Misstatements and omissions relating to the general scheme*

The SAC alleges that the statements Barnard and Abraham made to Rubin and Gold were part of a larger scheme by defendants to promote and sell ARS to the public.   RJA and RJFS are alleged to have "routinely and consistently" instructed their financial advisors throughout the United States  to promote ARS as "safe, highly liquid short-term investment vehicles suitable for any investor with at least $25,000 of available cash and as little as one week in which to invest."[130] They allegedly provided their financial advisors with information that insufficiently disclosed the ARS's risks of illiquidity.[131]  As in the FAC, however, the SAC fails to allege "exactly who made the misstatements and to whom, when (other than throughout the Class Period), where, how frequently and in what form."[132]  Indeed, with the exception of the statements made to Rubin and Gold, the SAC does not allege any specific statement made to any investor.

The closest it comes is the allegation that Raymond James, in the weeks after the August 2007 auction failures, published a website that insufficiently disclosed the risks associated with ARS.[133]  The SAC, however, fails to allege that any investor ever saw or even was told about the website.  In fact, the SAC repeatedly alleges that neither RJA nor RJFS ever informed any

---

[130]

See, e.g., *id.* ¶¶ 91, 144.

[131]

See, e.g., *id.* ¶¶ 68-82, 98-111, 119-127,145.

[132]

*Defer*, 654 F Supp. 2d at 214.

[133]

SAC ¶¶ 86, 11, 115, 124.

existing or prospective ARS holders of its existence.[134]  It moreover fails to allege particularly which defendant was responsible for its publication.[135]  Consequently, the SAC fails to allege sufficiently the circumstances in which the allegedly fraudulent statements were made.  It does not meet the stringent standards of Rule 9(b) and the PSLRA in this respect.[136]

C.      *Loss causation*

   Defendants next argue that the SAC fails to plead loss causation, "the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff."[137]  In order to satisfy this requirement, a complaint must allege that "the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered."[138]  The loss must be (1) foreseeable and (2) caused by the materialization of the concealed risk.[139]  A loss is foreseeable if it is "within

---

[134]

  *Id.*

[135]

  *See, e.g.,* ¶ 111 ("Defendants added the webpage on or around August 28, 2007.").

[136]

  *Defer,* 654 F. Supp. 2d at 215.

[137]

  *Lentell,* 396 F.3d at 172 (quoting *Emergent Capital Investment Management, LLC v. Stonepath Group, Inc.,* 343 F.3d 189, 172 (2d Cir. 2003)); *see also* 15 U.S.C. § 78u-4(b)(4); *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 342 (2005).

[138]

  *Lentell,* 396 F.3d at 175 (quoting *Suez Equity Investors, L.P. Toronto-Dominion Bank,* 250 F.3d 87, 95 (2d Cir. 2001)) (emphasis in *Lentell*).

[139]

  *Id.,* 396 F.3d at 173; *Suez Equity Investors, L.P.,* 250 F.3d at 95.

the zone of risk *concealed* by the misrepresentations and omissions alleged by the disappointed investor."[140]

The SAC alleges that the defendants' statements concealed the risk that the ARS market was liquid only as a result of auction dealer intervention.[141]  It alleges also that the ARS became illiquid and paid below-par interest rates because the auction dealers stopped intervening.[142] It thus alleges that the materialization of the allegedly concealed risk caused the plaintiffs' injuries. No more is required.

Relying on *In re Citigroup Auction Rate Securities Litigation*,[143] defendants argue that plaintiffs have not alleged loss causation because there are no allegations that either plaintiff made an effort to sell their securities or that the interest rates were affected by their wrongful conduct.[144]  Unlike *Citigroup*, however, the SAC alleges that "[p]laintiffs . . . .remain unable to sell their [ARS] at par and continue to receive interest and/or dividends on those securities at below market rates."  Construing this allegation in the light most favorable to the plaintiffs, the SAC alleges that plaintiffs tried to sell their ARS but were unable to do so.[145]

---

140

      *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 40 (2d Cir. 2009) (quoting *Lentell*, 396 F.3d at 173).

141

      *See, e.g.*, SAC ¶¶ 5-6, 144-48, 197-98.

142

      *See, e.g., id.* ¶¶ 205, 208-09.

143

      700 F. Supp. 2d 294 (S.D.N.Y. 2009).

144

      *Id.* at 307; Def. Br. at 40.

145

      Defendants also rely on *Healthcare Fin. Group, Inc. v. Bank Leumi USA*, 669 F. Supp. 2d 344, 348 (S.D.N.Y. 2009), for their argument that the CAC inadequately pleads loss causation.  That case is distinguishable as the market for the ARS at issue in that case froze,

II.   *Exchange Act Section 20(a)*

The SAC alleges that RJF and RJA are liable under Section 20(a) of the Exchange Act by virtue of their "operational and management control of RJFS"[146] and that RJF is similarly liable by virtue of its control of RJA.[147] As the only legally sufficient claim of a primary violation of the Exchange Act and Rule 10b-5 is that against RJA for the period November 2007 through the end of the Class Period, the only legally sufficient Section 20(a) claim is that against RJF for the same period.

*Conclusion*

For the foregoing reasons, defendants' motion to dismiss the complaint [DI 53] is granted in all respects except that motion is denied with respect to plaintiff Gold's (1) Section 10(b) and Rule 10b-5 claim against RJA for the period November 2007 through February 13, 2008, and (2) the Section 20(a) claim against RJF based thereon.

SO ORDERED.

Dated:       September 2, 2010

Lewis A. Kaplan
United States District Judge

---

in part, because the issuer defaulted. *Id.*

146    SAC ¶ 248.

147    *Id.* ¶ 258.